# **<u>Exhibit 1</u>**



| CIVIL ACTION COVER SHEET | DOCKET NO(S) **B.L.S.** 21~0198 | Trial Court Of Massachusetts Superior Court Department County: SUFFOLK |
|---|---|---|

| PLAINTIFF(S)<br>Douglas A. Wedge | DEFENDANT(S)<br>Lou Lamb Smith, individually and as administrators of the Estate of Robert Weston Smith; Tod Weston Smith, individually and as administrators of the Estate of Robert Weston Smith and WJ Entertainment LLC. |
|---|---|

| ATTORNEY, FIRM NAME, ADDRESS AND TELEPHONE Board of Bar Overseers number<br>William S. Rogers, Jr., BBO No.549487<br>Thomas M. Elcock, BBO No. 548027<br>Prince Lobel Tye LLP<br>One International Place<br>Boston, MA 02110<br>617-456-8000 | ATTORNEY (if known) |
|---|---|

Origin Code Original Complaint

TYPE OF ACTION AND TRACK DESIGNATION (See reverse side) CODE NO. TYPE OF ACTION (specify) TRACK IS A JURY CASE *
BD.1 Intellectual Properrty ____ (B) ☑ Yes ☐ No

The following is a full and detailed statement of the facts on which plaintiff relies to determine eligibility in to The Business Litigation Session.

Plaintiff brings this action seeking declaratory relief and monetary damages against defendants related to a dispute concerning the ownership of audio tapes and the copyrights of audio recordings of the late disc jockey and famous radio personality Robert Weston Smith ("Wolfman Jack"). The defendants are the widow and son of Wolfman Jack and a limited liability company that represents Wolfman Jack's estate.

For more than 40 years the plaintiff has purchased Wolfman Jack recordings from sources around the world and converted those recordings from reel-to-reel and cassette tapes into a digital format. The Plaintiff likely possesses the largest collection and possibly the only source of much of Wolfman Jack's radio broadcast and other recorded media. Approximately one-third of plaintiff's Wolfman Jack collection, which is approximately 2 terabytes, was purchased by the plaintiff from defendant Lou Lamb Smith. Plaintiff also purchased the copyrights to those recordings from defendant Mrs. Smith.

Defendants recently realized there is a lucrative market for selling Wolfman Jack recordings from the old Wolfman Jack radio program and are now claiming the plaintiff does not own any of the Wolfman Jack recordings in his possession and that he has been acting as an archiver for the defendants. The defendants have engaged in a campaign of harassment, including threats of criminal prosecution, to get the plaintiff to turnover his collection to them and sign an inaccurate agreement that characterizes the plaintiff as an "archiver" and offers grossly unfair and inequitable compensation. Plaintiff has refused to sign this agreement. Plaintiff seeks declaratory relief that he is the owner of the Wolfman Jack recordings he has purchased during the last forty years, including those purchased from Defendant, including copyrights, and seeks damages for breach of contract, breach of the covenant of good faith and fair dealing, intentional and negligent infliction of emotional distress and violation of G.L. c. 93A.

* A Special Tracking Order shall be created by the Presiding Justice of the Business Litigation Session at the Rule 16 Conference.

PLEASE IDENTIFY, BY CASE NUMBER, NAME AND COUNTY, ANY RELATED ACTION PENDING IN THE SUPERIOR COURT DEPARTMENT.

"I hereby certify that I have complied with the requirements of Rule 5 of the Supreme Judicial Court Uniform Rules on Dispute Resolution (SJC Rule 1:18) requiring that I provide my clients with information about court-connected dispute resolution services and discuss with them the advantages and disadvantages of the various methods." Signature of Attorney of Record _Thomas Elcock (MP)_
DATE: January 27, 2021

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss                              SUPERIOR COURT DEPARTMENT
                                         OF THE TRIAL COURT
                                         BUSINESS LITIGATION SESSION

```
                                    )
Douglas A. Wedge,                   )
       Plaintiff,                   )
                                    )
       v.                           )    Civil Action No.: 21-0198
                                    )
Lou Lamb Smith, Individually and as )
Administrator of the Estate of      )
Robert Weston Smith;                )
Tod Weston Smith, Individually and as)
Administrator of the Estate of      )
Robert Weston Smith and             )
WJ Entertainment LLC,               )
       Defendants.                  )
                                    )
```

**COMPLAINT**

**INTRODUCTORY STATEMENT**

Plaintiff, Douglas A. Wedge hereby brings this action seeking declaratory relief and monetary damages against Defendants, Lou Lamb Smith, individually and as administrators of the Estate of Robert Weston Smith; Tod Weston Smith, individually and as administrators of the Estate of Robert Weston Smith and WJ Entertainment, LLC, related to the ownership of audio tapes, a digital compilation and copyrights of recordings of the late disc jockey and famous radio personality, Robert Weston Smith ("Wolfman Jack"), and hereby pleads the following.

**THE PARTIES**

1.     The plaintiff, Douglas A. Wedge ("Mr. Wedge"), is an individual who resides in Brockton, Massachusetts.

iManageDB1\109624\000000\3632314.v1-1/27/21

2.      The defendant, Lou Lamb Smith ("Mrs. Smith"), is an individual who resides in Belvidere, North Carolina.  She is the widow Wolfman Jack and an administrator of her husband's estate.

3.      The defendant, Tod Weston Smith ("Mr. Smith"), is an individual who resides in Hertford, North Carolina.  He is Wolfman Jack's son and an administrator of his father's estate.

4.      The defendant, WJ Entertainment LLC ("WJE"), is a North Carolina limited liability company, with a business address of 105 River Shore Drive, Hertford NC 27944.  It represents the estate of Wolfman Jack.

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction over this action pursuant to G.L. c. 212, § 4 and G.L. c. 231A because an actual controversy exists between the parties.

6.      This Court has personal jurisdiction over the defendants based on their regular and persistent communications with Mr. Wedge in Massachusetts by letter, email and telephone, their repeated transaction of business with Mr. Wedge in Massachusetts, as well as their persistent conduct outside Massachusetts causing tortious injury in Massachusetts.

7.      Venue in this matter is proper in the Business Litigation Session pursuant to Superior Court Directive 17-1.

8.      The matter in controversy exceeds the sum or value of twenty-five thousand dollars ($25,000), exclusive of interest and costs.

## FACTS

### Background

9.      The Plaintiff, Mr. Wedge, is a hobbyist and a lifelong fan and admirer of Wolfman Jack.

2

10.     Wolfman Jack was a rock-and-roll disc jockey famous for his gravelly voice, exuberant on-air style and charismatic persona.  His career spanned more than 30 years from the 1960s to the 1990s during which he became one of America's best-known radio personalities. Wolfman Jack also became famous for his appearances in televisions shows, television commercials, infomercials and movies, including appearing as himself in George Lucas's 1973 film, "American Graffiti."  He died in 1995 at the age of fifty-seven and was survived by his wife, Defendant, Lou Lamb Smith, and son, Defendant Todd Weston Smith.[1]

11.     During the last forty (40) years, Mr. Wedge devoted enormous amounts of his personal time in locating and collecting Wolfman Jack recordings which were usually in the form of reel-to-reel or cassette tapes, which using his skill and expertise, he was able to convert to a digital storage medium.  Today, Mr. Wedge likely possesses the largest digital collection and possibly the only source of much of Wolfman Jack's radio broadcasts and other recorded media such as voice tracks, shows, jokes, bits, voice overs, and other audio memorabilia.

12.     Mr. Wedge collected Wolfman Jack tapes through his own perseverance and due diligence from many different sources and contacts across the globe, including radio stations, through the internet, numerous third-parties and, on some occasions, even retrieving discarded tapes from the trash or dumpsters.

13.     After collecting Wolfman Jack reel-to-reel or cassette tapes, Mr. Wedge painstakingly converted the tapes using his audio-engineering expertise into a digital format through a labor intensive and time consuming process he mastered over forty (40) years.  The process of preparing, or "baking", a single tape to then be able to convert its recorded contents

---

[1] See generally Wolfman Jack's obituary published in the New York Times on July 2, 1995 available at www.nytimes.com/1995/07/02/obituaries/wolfman-jack-raspy-voice-of-the-radio-is-dead-at-57.

into a digital format constitutes a full day's work, and requires further time and effort to then re-master the recording into in a clear, audible form.

14.     As described in detail below, over the years Mr. Wedge purchased Wolfman Jack tapes and other recorded memorabilia from Mrs. Smith.  The purchases Mr. Wedge made from Mrs. Smith comprise about one-third of his collection, which now totals approximately two Terabytes of digitalized Wolfman Jack recordings.

15.     Tape recording is not a permanent storage medium.  Tapes are subject to degradation over time and with exposure to atmospheric conditions and the natural elements. Without Mr. Wedge's unique expertise, devotion and the expenditure of extraordinary time and effort to convert the Wolfman Jack tapes into a digital format, the original recorded content of most if not all of the tapes he obtained over the years would have been lost.

**Mrs. Smith Sells Tapes To Mr. Wedge**

16.     Mr. Wedge started buying small amounts of Wolfman Jack tapes from Mrs. Smith starting in or around 2000.  Between 2000 and 2015, he made a few sporadic purchases. Payment was always made in advance. At Mrs. Smith's request, payment was by money order or wire transfer depending on Mrs. Smith's ability to get to her bank. After payment was received, Mrs. Smith would ship the tapes to Mr. Wedge in Massachusetts.

17.     Mr. Wedge first visited Mrs. Smith's home in North Carolina in 2003 or 2004. He purchased some Wolfman Jack tapes from Mrs. Smith and paid her in cash in person.

18.     During the ensuing years, Mrs. Smith and Mr. Wedge had many telephone conversations during which Mrs. Smith tried to sell Mr. Wedge Wolfman Jack tapes, material and other memorabilia because she badly needed money.  He politely listened to her many overtures and on occasions would purchase some tapes.  He would wire money to Mrs. Smith's

4

bank accounts as she specified in advance, and she would then ship the tapes to his home in Brockton by common carrier.

19.     In or about 2013, during one of their telephone conversations, Mrs. Smith implored Mr. Wedge to come to her home in North Carolina to salvage and buy tapes that were stored in various sheds and outbuildings on her property.  Mrs. Smith was worried the tapes would be destroyed because they were exposed to the elements in these dilapidated buildings that were later found to be infested with rodents and insects and their interior and contents covered in mold.

20.     Mr. Wedge was unable to travel to North Carolina at that time because he was employed fulltime and because he was the live-in caregiver for his elderly mother.

21.     In or around 2015, Mrs. Smith told Mr. Wedge she was in dire financial straits and was desperate to sell more Wolfman Jack tapes to him.  Mr. Wedge expressed a willingness to buy the tapes so that she could generate some income.

22.     Over the next few years, at least seventeen[2] separate sales followed.  In each instance, Mrs. Smith spoke with Mr. Wedge by telephone, promised to provide him with tapes in various forms, reel-to-reel or cassette, and set her price.

23.     Mr. Wedge would then make a wire transfer payment of Mrs. Smith's price in advance.  After receipt of the payment, Mrs. Smith would ship the tapes to Mr. Wedge in Brockton.

24.     Wire transfer records reflecting the seventeen transactions between "Douglas A. Wedge" as "Originator" and "Lou Lamb Smith d/b/a Wolfman Jack" as "Beneficiary" between June 3, 2015 and June 7, 2017 totaling $4,900.00, plus $425.00 in wire transfer fees have been

---

[2] Mr. Wedge cannot obtain his Bank's records for all of the tape purchase transactions without an archive search which will take weeks and is complicated by remote clerical work due to Covid-19.

obtained from Mr. Wedge's Bank.  A copy of these wire transfer records are attached as **Exhibit 1**.

25.     The "Reason For Payment" on sixteen of the wire transfers states "Memorabilia" or "Tapes and Memorabilia."  In one instances, the "Reason For Payment" states "To Pay Bill", which references an invoice Mrs. Smith incurred with a third-party to gather the tapes for shipment to Mr. Wedge.  Mr. Wedge considers all items concerning Wolfman Jack as his "memorabilia," including tape recordings, as they remain following his death in 1995.

### Mrs. Smith Sells The Copyrights

26.     In April of 2016, Mr. Wedge decided to travel to North Carolina at Mrs. Smith's request and buy for $1,000.00 any tapes that he could salvage from the sheds or outbuildings on her property ("salvage trip").

27.     To induce Mr. Wedge to make this trip, Mrs. Smith agreed to sell for an additional $1,000.00 the copyrights to all the tapes Mr. Wedge had purchased or would purchase in the future.

28.     Mr. Wedge would not have invested the time and money in making a trip to North Carolina together with two of his brothers, including renting a U-Haul trailer, unless he was getting ownership of both the recorded audio materials on the tapes and any copyrights for the audio materials.

29.     On April 7, 2016, Mr. Wedge made a $1,000.00 wire transfer payment, plus a $25.00 wire transfer fee, to Mrs. Smith.  The wire transfer reflects "Douglas A. Wedge" as "Originator" and "Lou Lamb Smith d/b/a Wolfman Jack" as "Beneficiary."  The "Reason For Payment" states "Receive Copyrights." A copy of this wire transfer record is attached as **Exhibit 2**.

6

30.     By this payment, Mr. Wedge paid for and received the copyrights to all Wolfman Jack recordings he purchased from Mrs. Smith, including the tapes he obtained at the ensuing salvage trip operation and previously, including but not limited to, the seventeen wire transfer transactions between 2015 to 2017 (See, **Ex. 1**), or at any other time.

**Mr. Wedge's April 10, 2016 Trip to Mrs. Smith's Home**

31.     On April 9, 2016, Mr. Wedge along with his brothers, Mike and Steve Wedge, traveled to Mrs. Smith's home in North Carolina to salvage and purchase tapes and other recorded memorabilia.  Mr. Wedge was told he could take *whatever he wanted* from inside the various sheds and outbuildings for $1,000.00.

32.     Upon their arrival at the Smith home on April 10, 2016, the Wedges noted Mrs. Smith's home was in disrepair, with a blue tarp was covering a collapsed wall of her home.

33.     The Wedges were granted complete access to the sheds and outbuildings and their contents.  These sheds and outbuildings, one of which appeared to have served as a studio for Wolfman Jack in its time, were in disrepair.

34.     The sheds and outbuildings had open holes in their roofs, broken and missing windows, and were open and abandoned to the elements.  Photographs reflecting the conditions of the Smith home and its sheds and outbuildings are attached as **Exhibit 3**.

35.     The sheds and outbuildings were found on inspection to be full of trash and debris, and to have been infested with rodents, insects and further that most of the surfaces inside, including boxes and their contents, including the various tapes themselves, were covered with black mold.  These conditions indicated that the tapes had been exposed to these adverse conditions for many years.  The Wedges had to carefully survey and remove reel-to-reel tapes,

7

cassettes and the other recorded memorabilia they were purchasing in the midst of these conditions.

36.     In addition to Mrs. Smith, her son, Mr. Smith, was also present when the Wedges arrived.  He opened and briefly entered one of the outbuildings, which appeared to be the old Wolfman Jack studio.  He said it brought back old memories, and that he had not been in that building "for decades."  Mr. Smith did not enter any of the other sheds or outbuildings at any time or assist the Wedges in anyway.  Instead, he sat outside chatting with his mother and occasionally with the Wedges, while showing them family pictures on his cell phone.

37.     Neither Mrs. Smith nor Mr. Smith made any attempt to examine the materials being removed from the sheds and outbuildings, or to otherwise inspect or inventory the materials.  This was because they were selling the sheds' and outbuildings' contents to the Wedges for payment on a "take what you want" basis, and they had no expectations of ever receiving anything back from Mr. Wedge at any time or in any form.  The same was true for all Mr. Wedge's tape purchase transactions from Mrs. Smith.

38.     On the final day of their salvage operation, which occurred over three days, Mr. Michael Wedge provide Mrs. Smith with a $1,000.00 check on behalf of Mr. Wedge for purchase of all the tapes and recorded memorabilia rescued from the sheds and outbuildings.  A copy of this check dated April 12, 2016 drawn on Mike Wedge's Bank of America checking account payable to "Lou Smith" is attached as **Exhibit 4**.

39.     After this visit, as noted in paragraphs No. 22-25 above, Mr. Wedge continued to purchase tapes from Mrs. Smith until June 7, 2017.

40.     Mr. Wedge purchased the reel-to-reel, cassettes and other tapes from Mrs. Smith outright, with no further duty or obligation of any kind to her, to Mr. Smith or Defendant WJE.

8

41.     Because of the foregoing, Mr. Wedge owns all of the tape materials in his possession, in both original and digitized format, including all copyrights to their contents.

**Mr. Smith Realizes There Is A Market For Wolfman Jack Recordings**

42.     Mr. Smith recently realized there is a potentially lucrative market for selling Wolfman Jack recordings from the old Wolfman Jack radio program and he formed a company, WJE, to pursue this market.  Mr. Smith began trying to dupe Mr. Wedge into sharing his digital archive collection, going so far as to unilaterally send Mr. Wedge an external computer hard-drive for Mr. Wedge to use in transferring his entire digital archive collection without any immediate offer of compensation for hundreds if not thousands of hours of his personal time and expertise, whatsoever.  Mr. Wedge refused, and never even opened the contents of the envelope containing the hard-drive that Mr. Smith told Mr. Wedge he had sent him.

**Defendants' 2020 Demand For Mr. Wedge's Entire 2 TB Audio Collection**

43.     Starting in 2020, the defendants now claimed that Mr. Wedge did not own any of part of his Wolfman Jack audio collection.  They claimed ownership of all things related to Wolfman Jack, including all audio recordings in Mr. Wedge's possession, of which he had purchased less than one-third in transactions from the Smiths.  Mr. Wedge had largely purchased and/or collected the tapes for most of his collection from many other sources, and converted all of it to digitalized format, during the last forty years of his life.

44.     The defendants claimed ownership of Mr. Wedge's two terabyte digitized audio collection claiming now that Mr. Wedge was acting as a mere "archiver" for the Smiths and / or WJE, and he was not the rightful owner of any Wolfman Jack recordings.

9

45.     While Mr. Wedge was flattered by the "archiver" reference, he never acted as an archiver for the Defendants.  He purchased tapes and the copyrights to the tapes outright from Mrs. Smith, with no obligation to work with or provide anything to the Defendants in the future.

46.     In June of 2020, Mr. Smith sent to Mr. Wedge an unsolicited Archiver Agreement which he demanded be immediately signed and returned.  The Agreement stated the defendants were the owners of, *inter alia*, all audio voice tracks and recordings of Wolman Jack and that Mr. Wedge had been a "digital archiver for the past twenty-five (25) years."  Among other terms, the Agreement obligated Mr. Wedge to turnover his entire collection of digitized Wolfman Jack audio recordings.

47.     The agreement included grossly unfair, inequitable,  de minimus, and possibly illusory, compensation to Mr. Wedge with respect potential future radio, podcasts or streaming audio deals which may be negotiated by the Defendants.

48.     The agreement was sent to Mr. Wedge pre-signed by Mr. Smith on behalf of Defendants.  Extraordinary pressure was then applied to Mr. Wedge to sign the Agreement because Mr. Smith had a Wolfman Jack related radio project that he characterized as time sensitive and conditioned on the Archiver Agreement being executed by Mr. Wedge.

49.     The Archiver Agreement was allegedly prepared by legal counsel for the Smiths and WJE in North Carolina.  However, after Mr. Wedge did not execute and return the Archiver Agreement, the Smiths engaged an entertainment lawyer from Pennsylvania to attempt to negotiate a new "deal" with Mr. Wedge.

50.     Mr. Wedge's counsel disputed all the Smiths' and WJE's allegations with the Smiths'/WJE's entertainment counsel consistent with the allegations in this Complaint, and no deal was ever reached.  Repeated demands by Mr. Wedge's counsel for proof of alleged

copyrights held by the Smiths and/or WJE went without any substantiation or proof by the Smiths or WJE.  On information and belief, there are no copyright registrations for the Wolfman Jack sound recordings, and therefore, no relief may be provided even if the Smiths and/or WJE counterclaim for copyright infringement in this case.

51.     Instead, the Smiths and/or WJE have claimed alleged oral agreements obligating Mr. Wedge to serve as their archiver or to attempt to claim another purpose for Mr. Wedge's payments to Mrs. Smith for tape purchases dating back to 2000, which strain the limits of credulity.  Mr. Wedge's counsel repeatedly called on the Smith's/WJE's counsel to stop the harassment by his clients and their surrogates of Mr. Wedge.

52.     When Mr. Wedge did not sign the Archiver Agreement, the defendants threatened litigation and engaged in a further campaign of harassment, defamation and threats, including threatening to have Mr. Wedge criminally prosecuted in North Carolina.

53.     The harassment included multiple telephone calls and voice messages from Lou Lamb Smith and from Jay Harvey, a former co-producer of Wolfman Jack's radio show

54.     While the Smiths were seeking execution of the Archiver Agreement, Mrs. Smith and Mr. Smith called his home telephone number and left multiple voice messages for him.  This was a form of continuing harassment.  Mrs. Smith used any excuse to call and harass Mr. Wedge, including calling and singing to him on his birthdate.

55.     This pattern of persistent harassment was what finally compelled Mr. Wedge to seek the advice and assistance of legal counsel and led counsel to deal with the Smith's and WJE's entertainment lawyer.

56.     The harassment included the Defendants accusing Mr. Wedge of violating copyrights they claim to own by Mr. Wedge posting Wolfman Jack audio recordings on various websites.

57.     The audio recordings posted by Mr. Wedge of Wolfman Jack on websites did not come from his personal Wolfman Jack digital collection.  Rather, the audio recordings were obtained and re-posted from other internet websites in the public domain.  Mr. Wedge's posting of those audio recordings from other public sources was a form of fair use, protected by the Fair Use doctrine.

58.     The harassment also included the Defendants engaging surrogates and agents to send threatening and defamatory emails to Mr. Wedge.

59.     On September 23, 2020 Lonnie Napier, a former producer of the Wolman Jack radio show, sent a threatening, and disparaging email to Mr. Wedge.

60.     Mr. Napier accused Mr. Wedge of acting "like a creepy con man that depends on **stealing**…from the estate of Wolfman Jack[.]  He claimed the estate "owns every facet of audio you possess in your basement studio" and threatened he was scheduled to do a "series of TV documentaries talking about my time with Wolfman and … I will gladly tell them the story of a guy in Brockton, Massachusetts who **illegally** hawks bootleg copies of material performed by Wolfman Jack[.]"  Further, "we're getting a press release ready that reports all of the facts related to the **illegal** dealings of the Wolfman material."  A copy of this email is attached as **Exhibit 5**, emphasis added.

61.     The harassment campaign also included Durand ("Randy") Achée sending threatening emails to Mr. Wedge accusing him of stealing from the Smith Family.  Mr. Achée is Mr. Smith's first cousin and the oldest of Wolfman Jack's six nieces and nephews.

12

62.     Mr. Achée sent an email to Mr. Wedge on November 8, 2020 accusing Mr.
Wedge of "**steal[ing]**" Wolfman's legacy from his family.  The email further asserted: "[Y]ou
DO NOT have any Commercial or Copyright ownership or ANY rights to Wolfman Jack, or his
radio shows or the audio materials owned by the estate that are in your possession."  The email
continued that Tod and Mrs. Smith have retained "top litigators"; that "all property" must be
"fully returned to their rightful owners" and rhetorically asked Mr. Wedge "how do you wish to
be remembered?... as a friend and supporter", as the Archiver and Historian, or someone who is
an enemy and **a thief.**"  A copy of this email is attached as **Exhibit 6**, emphasis added.

63.     Mr. Achée sent a second email to Mr. Wedge on November 12, 2020.  In this
email, Mr. Achée asserted:  "Again, let me be clear, all the rights, copyrights and materials
having anything to do with Wolfman Jack are the legal property of the Estate and the Smith
family. That includes all the digitized recordings you have in your possession."  The email
further "demand[ed] the digitized recordings and any materials related to Wolfman Jack be
immediately returned to the Smith's in North Carolina" and threatened an imminent legal action
if Mr. Wedge did not capitulate to the Smith family's demands.  A copy of this email is attached
as **Exhibit 7**.

64.     During this time, the Pennsylvania entertainment lawyer professed to have no
knowledge of these actions by his clients, or their surrogates, and that his clients denied such
actions notwithstanding reports of Mr. Wedge's home call logs, voice recordings and even email
evidence.  Eventually the Pennsylvania entertainment lawyer just disappeared in October, 2020,
and no longer replied to Mr. Wedge's counsel's communications and protests.

65.     For nearly three months, Mr. Wedge and his counsel heard nothing from the
Smiths and WJE.  In January, 2021, Mr. Wedge and his counsel heard from yet a third lawyer

13

representing the Smiths and WJE, this time from another Pennsylvania law firm now threatening both litigation and criminal prosecution as a means to coerce Mr. Wedge.

### **The Threat Of Criminal Prosecution If Mr. Wedge Did Not Settle**

66.     The Smiths and WJE's course of harassment now included a threat of criminal prosecution made by the Defendants personally, and by and though their new Pennsylvania lawyers in meetings with Perquimans County District Attorney Andrew Womble ("DA Womble") in North Carolina as detailed in a January 7, 2021 demand letter (the "January 7 letter").

67.     The January 7 letter stated the defendants' lawyers had recently "met with Perquimans County District Attorney Mr. Womble and his chief investigator and that office is presently conducting an investigation into this matter for purposes of pursuing criminal charges against Mr. Wedge." Further, it states that defendants' counsel are poised to file a multi-count action against Mr. Wedge in North Carolina.

68.     The letter concluded that should Mr. Wedge wish a resolution "in advancement of criminal and/or civil proceedings, defendants' counsel should be contacted within five days and absent resolution cooperation with the Perquimans County Office of the District Attorney" will continue. A copy of this January 7 letter is attached as **Exhibit 8.**

69.     Upon receipt of the January 7 letter, Mr. Wedge's counsel immediately placed a telephone call to DA Womble requesting to speak to him about the Smith's factually inaccurate and unfounded allegations. DA Womble's victim/witness staff personnel took all of Mr. Wedge's counsel's contact information, and even called counsel back to verify same, but to date, DA Womble has not contacted Mr. Wedge's counsel.

iManageDB1\109624\000000\3632314.v1-1/27/21

70.     The new Pennsylvania counsel even confirmed that they had provided to DA

Womble the parties' confidential settlement communications, exchanged under express claim of

the settlement privilege and repeated reservations of rights, concerning efforts by the

entertainment lawyer to negotiate a "deal" with Mr. Wedge and his counsel after the Archiver

Agreement was rejected.

71.     All of the harassment, including that culminating in the alleged complaint to DA

Womble, has caused Mr. Wedge to suffer emotional distress with physical manifestations of

such distress including but not limited to, sleep loss, exhaustion, loss of appetite and other

physical symptoms and complaints.

<u>**Count I - Declaratory Relief**</u>
(Against All Defendants)

72.     Mr. Wedge incorporates by reference each of the allegations contained in the

preceding paragraphs, as if fully set forth here in their entirety.

73.     This Count is brought pursuant to the Massachusetts Declaratory Judgment Act,

G.L. c. 231A.

74.     An actual controversy exists between the parties as to:

    a.  Whether Mr. Wedge is the owner of the reel to reel, cassettes, other tapes and
        audio recordings he purchased from Defendant Lou Lamb Smith.

    b.  Whether Mr. Wedge owns the copyright or other intellectual property to the
        reel-to-reel, cassettes, other tapes and audio recordings he purchased from
        Defendant Lou Lamb Smith.

    c.  Whether Mr. Wedge owns all of the Wolfman Jack materials in his
        possession, in both original and digitized format.

    d.  Whether Mr. Wedge has been acting as an archivist for the Defendants during
        the last twenty-one years.

iManageDB1\109624\000000\3632314.v1-1/27/21

Wherefore, a declaratory judgment should enter in favor of Mr. Wedge and against the Defendants on each of these disputed issues.

## Count II - Breach of Contract
(Against Mrs. Smith)

75.     Mr. Wedge incorporates by reference each of the allegations contained in the preceding paragraphs, as if fully set forth here in their entirety.

76.     Mr. Wedge contracted to buy, and did buy outright, the physical tapes and copyrights to all of the Wolfman Jack rights held by the Smiths or the Estate from Mrs. Smith, and paid Mrs. Smith in advance.

77.     Mrs. Smith is breaching the parties' contracts by claiming the defendants retain ownership and title to the tapes, to the copyrights of the tapes, and to the digital conversions of the tapes that were purchased by Mr. Wedge.

78.     As a direct and proximate result of the breaches, Mr. Wedge has suffered damages, including not being able to use the tapes for commercial purposes and the costs associated with the prosecution of this suit in order to compel the defendants to honor their contractual agreements.

WHEREFORE, Mr. Wedge requests that this Honorable Court enter judgment against the Defendants for monetary damages together with interest and costs.

## COUNT III - BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
(Against Mrs. Smith)

79.     Mr. Wedge incorporates by reference each of the allegations contained in the preceding paragraphs, as if fully set forth here in their entirety.

80.     Inherent in every contract is an implied covenant of good faith and fair dealing which required the Mrs. Smith to treat Mr. Wedge fairly and in good faith.

16

81.     As set forth in detail above, Mrs. Smith violated the covenant of good faith and fair dealing by failing to recognize that she sold to Mr. Wedge and Mr. Wedge bought outright the physical tapes and copyrights to all of the Wolfman Jack rights held by the Smiths or the Estate, and paid Mrs. Smith in advance.

82.     The defendants are trying to deny Mr. Wedge the benefit of his bargain for clear title and possession of the tapes, copyrights and his digital archive.

83.     As a direct and proximate result of the Defendants' breach of the implied covenant of good faith and fair dealing, the Plaintiff has incurred substantial damages for which the defendant are liable in an amount to be proven at trial, plus interest, attorney's fees, and court costs.

WHEREFORE, Mr. Wedge requests that this Honorable Court enter judgment against Mrs. Smith for monetary damages together with interest and costs.

## COUNT IV - INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (Against All Defendants)

84.     Mr. Wedge incorporates by reference each of the allegations contained in the preceding paragraphs, as if fully set forth here in their entirety.

85.     The Defendants' conduct as described above, including, but not limited to, threatening criminal prosecution, was intended to inflict emotional distress and the Defendants knew, or should have known, that its conduct was likely to result in emotional distress to Mr. Wedge.

86.     Defendants' conduct was extreme, outrageous, and beyond all possible bounds of decency which is utterly intolerable in a civilized society.

87.     Mr. Wedge was emotionally distressed by Defendants' conduct and Defendants' conduct was the proximate cause of his distress.

88.     The emotional distress sustained by Mr. Wedge was severe and of a nature that no reasonable person could be expected to endure.

89.     Mr. Wedge has incurred great injuries of the body and mind due to his emotional distress.

WHEREFORE, Mr. Wedge requests that this Honorable Court enter judgment against the Defendants for monetary damages together with interest and costs.

## COUNT IV - NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
### (Against All Defendants)

90.     Mr. Wedge incorporates by reference each of the allegations contained in the preceding paragraphs, as if fully set forth here in their entirety.

91.     The Defendants were negligent, reckless, and/or grossly negligent in their actions, omissions, misrepresentations, practices and courses of conduct as described herein.

92.     The Defendants knew or should have known that emotional distress was the likely or foreseeable result of their actions, omissions, misrepresentations, practices and courses of conduct as described herein.

93.     The actions, omissions, misrepresentations, practices and courses of conduct of the Defendants was the cause of the Plaintiffs emotional distress, with physical manifestations.

94.     The emotional distress sustained by the Plaintiff was of such nature that a reasonable person would have suffered emotional distress under the circumstances.

95.     As a direct and proximate cause of the Defendants, Mr. Wedge has suffered damages, including but not limited to severe mental and emotional distress, with physical manifestations thereof and other injuries and damages to his detriment.

WHEREFORE, Mr. Wedge requests that this Honorable Court enter judgment against the Defendants for monetary damages together with interest and costs.

iManageDB1\109624\000000\3632314.v1-1/27/21

## Count VII - Violations of G.L. c. 93A, § 11
### (Against All Defendants)

96.     Mr. Wedge incorporates by reference each of the allegations contained in the preceding paragraphs, as if fully set forth here in their entirety.

97.     Massachusetts General Laws Chapter 93A, § 2 prohibits the use or employment of unfair or deceptive acts or practices in the conduct of trade or commerce.

98.     The Defendants engaged in the conduct of trade or commerce within the Commonwealth of Massachusetts including, *inter alia*, their regular communications with Mr. Wedge in Massachusetts by letter, email and telephone and their transacting of business with Mr. Wedge in Massachusetts.

99.     The Defendants' actions as described herein occurred primarily and substantially in of Massachusetts.

100.    The harm suffered by Mr. Wedge occurred in Massachusetts.

101.    Pursuant to G.L. c. 93A §11, the Defendants have engaged in unfair and deceptive acts or practices as described herein including, *inter alia*, by: failing to acknowledge that they sold to Mr. Wedge, and Mr. Wedge bought outright, the physical tapes and copyrights to all of the Wolfman Jack rights held by the Smiths or the Estate in bad faith; denying Mr. Wedge the good faith benefit of his bargain for clear title and possession of the tapes, copyrights and his digital archive; trying to dupe Mr. Wedge into turning over his entire digital archive to the defendants, attempting to get Mr. Wedge to sign an inaccurate and commercially unreasonable Archiver Agreement and, when he refused do so, engaged in campaign of harassment, including threatening criminal prosecution.

102.    Mr. Wedge has suffered the loss of money or property as a result of the defendants' unfair and deceptive acts or practices.

19

103.    The defendants' violations of G.L. c. 93A were willful and knowing entitling Mr.

Wedge to double or treble damages and attorneys' fees and costs.

**DEMANDS FOR RELIEF**

WHEREFORE, the Plaintiff Douglas A. Wedge, demands the following relief:

A.    The Court enter a judgment declaring, determining and adjudging that:

    i.    Mr. Wedge is the owner of the reel to reel, cassettes, other tapes and audio recordings he purchased from Defendant Lou Lamb Smith.

    ii.   Mr. Wedge is the owner of the copyrights to reel to reel, cassettes, other tapes and audio recordings he purchased from Defendant Lou Lamb Smith.

    iii.  Mr. Wedge owns all of the Wolfman Jack materials in his possession in both original and digitized format.

    iv.   Mr. Wedge has not been acting as an archivist of the Defendants during the last twenty-one years.

B.    Award monetary damages on Counts I-VII, including double or treble his actual

damages to Mr. Wedge on Count VII in an amount to be determined at trial, plus statutory

interest and costs; and

C.    Award Mr. Wedge all further relief as this Court deems just and proper including

awarding him his reasonable Attorneys' fees and costs on Count VII in accord with c. 93A, §11.

**DEFENDANT DEMANDS TRIAL BY JURY ON ALL COUNTS SO TRIABLE**

Douglas A. Wedge,

By his Attorneys,

*/s/* William S. Rogers, Jr.
William S. Rogers, Jr., BBO No.549487
wsrogers@princelobel.com
Thomas M. Elcock, BBO No. 548027
telcock@princelobel.com
Prince Lobel Tye LLP
One International Place
Boston, MA  02110

20

617-456-8000

Dated: January 27, 2021

21